No. 18-1478

# In the United States Court of Appeals for the Seventh Circuit

RICKEY I. KANTER,

Plaintiff-Appellant,

v.

JEFFERSON B. SESSIONS, III, et al.,

Defendants-Appellees.

Appeal from a Judgment of the United States District Court
for the Eastern District of Wisconsin
The Hon. William C. Griesbach, Chief Judge
(Dist. Ct. No. 2:16-cv-01121-WCG)

BRIEF OF AMICUS CURIAE
SECOND AMENDMENT FOUNDATION, INC.
IN SUPPORT OF APPELLANT URGING REVERSAL

Alan Gura
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

April 17, 2018        Counsel for Amicus Curiae

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>18-1478</u>

Short Caption: <u>Rickey I. Kanter v. Jefferson B. Sessions, III, Attorney General of the United States, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[　]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

<u>Second Amendment Foundation, Inc.</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Gura PLLC</u>

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

<u>None</u>

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

<u>None</u>

Attorney's Signature:  <u>s/ Alan Gura</u>                    Date:  <u>April 16, 2018</u>

Attorney's Printed Name:  <u>Alan Gura</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes**  <u>✕</u>    **No** <u>　　</u>

Address:  <u>916 Prince Street, Suite 107</u>
<u>Alexandria, VA 22314</u>

Phone Number:  <u>703.835.9085</u>          Fax Number:  <u>703.997.7665</u>

E-Mail Address:  <u>alan@gurapllc.com</u>

rev. 01/15 GA

## TABLE OF CONTENTS

Table of Contents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Interest of Amicus Curiae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      The Right to Arms Belongs to Law-Abiding, Responsible
        Individuals. Only Dangerousness—a Heightened Risk
        that an Individual Would Pose if Armed—Justifies
        Disarmament.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     Felon Disarmament Laws Are Subject to Individualized
        As-Applied Challenges.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      Legislatures Cannot Define the Scope of a
                Constitutional Right.. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      This Court Follows the Majority Rule Allowing
                Individualized As-Applied Challenges to Felon
                Disarmament Laws.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  Rickey Kanter Is Entitled to Relief Because He Is A Law-Abiding, Responsible Citizen Posing No Heightened Risk of Gun Violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.  The District Court Erred in Refusing to Acknowledge Kanter's Individualized Claim. . . . . . . . 22

    B.  Kanter's Claim Requires Only One Step. . . . . . . . . . 23

IV.  While Policy Considerations Cannot Override Fundamental Rights, Failure to Acknowledge Individualized Relief from Felon Disarmament Laws Would Have Absurd and Dangerous Results. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

TABLE OF AUTHORITIES

Cases

*Binderup* v. *Atty. General*,
　　836 F.3d 336 (3d Cir. 2016) (en banc) . .　10-13, 16-18, 25, 26, 29, 30

*Borden's Farm Products Co.* v. *Baldwin*,
　　293 U.S. 194 (1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Britt* v. *State*,
　　363 N.C. 546, 681 S.E.2d 320 (N.C. 2009). . . . . . . . . . . . . . . . . 26

*Cohens* v. *Virginia*,
　　19 U.S. (6 Wheat.) 264 (1821). . . . . . . . . . . . . . . . . . . . . . . . . 29

*District of Columbia* v. *Heller*,
　　554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Ezell* v. *City of Chicago*,
　　651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 1, 24-26

*Ezell* v. *City of Chicago*,
　　846 F.3d 888 (7th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . 1, 25

*Fortson* v. *L.A. City Attorney's Office*,
　　852 F.3d 1190 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Hamilton* v. *Pallozzi*,
　　848 F.3d 614 (4th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . 20, 21

*In re United States*,
　　578 F.3d 1195 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 20

*Kaemmrling* v. *Lappin*,
　　553 F.3d 669 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 27

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010)..................................... 1

*Moore* v. *Madigan*,
    702 F.3d 933 (7th Cir. 2012) ........................... 1, 9

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco,*
    *Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ........ 8, 11

*Rummel* v. *Estelle*,
    445 U.S. 263 (1980)................................... 16

*Schrader* v. *Holder*,
    704 F.3d 980 (D.C. Cir. 2013)..................... 5, 20, 26, 28

*Suarez* v. *Holder*,
    255 F. Supp. 3d 573 (M.D. Pa. 2015). ..................... 27

*United States* v. *Bass*,
    404 U.S. 336 (1971)................................... 9

*United States* v. *Chovan*,
    735 F.3d 1127 (9th Cir. 2013) .......................... 17

*United States* v. *Marcavage*,
    609 F.3d 264 (3d Cir. 2010) ........................... 15

*United States* v. *McCane*,
    573 F.3d 1037 (10th Cir. 2009)......................... 20

*United States* v. *Phillips*,
    827 F.3d 1171 (9th Cir. 2016)....................... 19, 21

*United States* v. *Rozier*,
    598 F.3d 768 (11th Cir. 2010) (per curiam) ................. 21

*United States* v. *Scroggins*,
    599 F.3d 433 (5th Cir. 2010)................................ 21

*United States* v. *Torres-Rosario*,
    658 F.3d 110 (1st Cir. 2011) ...................... 14, 18, 19

*United States* v. *Vongxay*,
    594 F.3d 1111 (9th Cir. 2010)............................ 21

*United States* v. *Williams*,
    616 F.3d 685 (7th Cir. 2010)..................... 18, 21, 26

*United States* v. *Woolsey*,
    759 F.3d 905 (8th Cir. 2014) ........................... 19

*United States* v. *Yancey*,
    621 F.3d 681 (7th Cir. 2010) ...................... 9, 12, 14

*Wash. State Grange* v. *Wash. State Republican Party*,
    552 U.S. 442 (2008)................................... 15

*Wis. Right to Life, Inc.* v. *FEC*,
    546 U.S. 410 (2006) (per curiam). ................... 14, 15

*Wrenn* v. *District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) .................. 7, 11, 23-25

Constitutional Provisions

U.S. Const. amend. II. ..................................... 5

## Statutes and Rules

18 Pa. C.S. § 6105(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 925(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Fla. Stat. § 379.233. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fla. Stat. § 403.161(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Mass. Gen. Law c. 129, § 39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Mass. Gen. Law c. 129, § 43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Mass. Gen. Law c. 266, § 30A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

N.J. Stat. Ann. § 2C:39-7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Wis. Stat. § 941.29(1m). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Other Authorities

Adam Winkler, *Heller's Catch-22*,
    56 UCLA L. Rev. 1551 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bernard Schwartz,
    *The Bill of Rights: A Documentary History*
    (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. Kevin Marshall, *Why Can't Martha Stewart
    Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y
    695 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Debates and Proceedings in the Convention of the
      Commonwealth of Massachusetts Held in
      the Year 1788* (Boston, William White 1856). . . . . . . . . . . . . . . . 10

Erika Pesantes, *Love hurts: Man arrested for
      releasing helium balloon with his girlfriend*,
      Sun Sentinel, February 22, 2013, available at
      http://articles.sun-sentinel.com/2013-02-22/
      news/fl-helium-balloon-environmental-
      crime-20130222_1_helium-balloon-fhp-
      trooper-wood-storks (last visited Apr. 17, 2018). . . . . . . . . . . . . 30

Megan Cassidy, *A visceral reaction with no time to spare:
      Arizona man gives emotional account of saving DPS
      trooper*, Arizona Republic, Jan. 24, 2017, available at
      http://www.azcentral.com/story/news/local/southwest-
      valley/2017/01/24/phoenix-man-gives-emotional-recount-
      taking- life-save-trooper/97005886/ (last visited Apr. 17, 2018). . . 31

*State of Florida* v. *Anthony Cade Brasfield*,
      Broward County (Fl.) Case No.
      13002444CF10A (filed Feb. 18, 2013). . . . . . . . . . . . . . . . . . . . . . . 31

INTEREST OF AMICUS CURIAE

Second Amendment Foundation, Inc. ("SAF") is a non-profit tax-exempt educational foundation, with over 650,000 members and supporters throughout the United States, dedicated to the preservation of Second Amendment rights. Through its legal action programs, SAF is a leading defender of the right to keep and bear arms. Among its achievements, SAF prevailed before the Supreme Court in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), establishing that the Fourteenth Amendment applies the right to arms as against states and localities. SAF's victories have included *Ezell* v. *City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*"); *Moore* v. *Madigan*, 702 F.3d 933 (7th Cir. 2012); and *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*").

SAF regularly investigates and assists claims for individualized as-applied relief from felon disarmament laws, often by sponsoring litigation. This case will set precedent directly impacting the fundamental rights of many individuals, including SAF members, who may be eligible for as-applied relief from felon disarmament laws.[1]

---

[1]No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund

## INTRODUCTION

Nobody seriously questions the government's ability to disarm violent and irresponsible people. Nor is there much doubt that Section 922(g)(1)'s so-called "felon in possession" ban, and the provision's state analogues, are constitutional on their face.[2]

Yet most courts that have considered the matter—including this one—agree that felon dispossession laws are subject to individualized as-applied challenges. Contrary to circuit precedent, the District Court's dismissal of Rickey Kanter's individualized as-applied challenge turned not on Kanter's specific circumstances, but on his status as a felon. Accordingly, that decision is a candidate for summary reversal. And because the defendants have essentially slept on their rights in the face of Kanter's summary judgment motion, on remand the District Court has no choice but to enter judgment for Kanter, provided that his unchallenged evidence is relevant to his claim.

---

preparing or submitting the brief. No person, other than amicus curiae, its members or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

[2]All statutory references are to Title 18 of the United State Code unless noted otherwise.

It is. Yet as the opinion below demonstrates, the lower courts require guidance as to why people subject to categorical disarmament laws may seek individualized relief, the proper basis for claiming relief, and the methodology to be applied in considering such cases. This Court should take the opportunity to provide this urgently-needed clarity.

### SUMMARY OF ARGUMENT

Logic and precedent require affording individuals the prospect of relief from categorical disarmament provisions. That is especially true of Section 922(g)(1), which, unlike some state disarmament laws that focus on the nature of predicate offenses, *e.g.* violent or drug crimes, bars firearm possession on the basis of the underlying offense's potential sentence. Since legislatures have a largely free hand in defining crimes and their sentencing ranges, rubber-stamping the permanent deprivation of a fundamental right on the basis of such legislative actions would essentially empower legislatures to define the scope of a fundamental constitutional right. Rights, however, are recognized by the Constitution.

Moreover, the Supreme Court has declared felon disarmament "presumptively lawful." *District of Columbia* v. *Heller*, 554 U.S. 570, 626-27 n.26 (2008). Generally, presumptions can be overcome. When a challenger shows that the conditions ordinarily justifying disarmament are absent, the presumption disappears.

Felon disarmament laws lack direct Framing Era antecedents, but they relate to the ancient practice of disarming dangerous individuals. Dangerousness—a propensity for violent or irresponsible behavior beyond that of ordinary citizens—has always been and remains the touchstone for determining whether individuals may be barred from possessing firearms.

Because this case asks whether Rickey Kanter, specifically, is so dangerous as to warrant disarmament, it does *not* raise an interest-balancing, two-step question. A facial challenge to Section 922(g)(1), or a categorical as-applied challenge to that provision, might well be resolved by deciding whether disarming felons or some other category of people, as a general matter, is properly tailored to a public safety interest. But here, what happens generally is irrelevant. The question is whether

4

*Kanter* "has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home." *Schrader* v. *Holder*, 704 F.3d 980, 992 (D.C. Cir. 2013). If Kanter carries his burden in defeating the presumption that he should be disarmed on account of dangerousness, disarming him cannot advance any government interest. There is nothing to balance, no second step, no means-ends scrutiny.

To be sure, Congress and the states may legislate broadly in this area. But the broader they legislate, the more care must be given to avoid denying law-abiding, responsible citizens the right to access arms for their defense. Ideally, legislatures would draft more careful laws, but courts cannot shirk their duty to safeguard fundamental rights. The failure to recognize claims for individualized as-applied relief would also lead to absurd and dangerous results.

## ARGUMENT

### I. THE RIGHT TO ARMS BELONGS TO LAW-ABIDING, RESPONSIBLE INDIVIDUALS. ONLY DANGEROUSNESS—A HEIGHTENED RISK THAT AN INDIVIDUAL WOULD POSE IF ARMED—JUSTIFIES DISARMAMENT.

The Second Amendment provides that the right to keep and bear arms is a "right of the People." U.S. Const. amend. II. And yet rights of

"the People" are not necessarily enjoyed by all people at all times. Like all rights, the right to arms has a particular scope; some of the People, often due to their conduct, will stand outside of it.

Legislatures may disarm individuals for reasons and along grounds that would have been familiar to the Framers. But no iron rule holds that anything that legislatures might enact must automatically be constitutional under any and all circumstances—especially when those provisions, such as Section 922(g)(1), date from a time when legislatures lacked authoritative judicial instruction as to the Second Amendment's requirements.

Today, precedent is not silent as to who amongst the People has the right to arms. The Supreme Court began its analysis of the Second Amendment "with the strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581. It did not detail the Second Amendment right's full contour, but held that "law-abiding, responsible citizens" enjoyed the right. *Id.* at 635.

The D.C. Circuit recently expounded upon the principle in striking down an ordinance that reserved the right to carry guns to a tiny fraction of "the People." "[T]he right to carry is a right held by responsible, law-abiding citizens for self-defense . . . 'responsible' must include those who are no more dangerous with a gun than law-abiding citizens generally are." *Wrenn* v. *District of Columbia*, 864 F.3d 650, 664 (D.C. Cir. 2017) (citation omitted). "At a minimum, then, the Second Amendment must enable armed self-defense by commonly situated citizens: those who possess common levels of need and pose only common levels of risk." *Id.* "[T]he point of the Amendment [is] that guns would be available to each responsible citizen as a rule (i.e., at least to those no more prone to misuse that access than anyone else)." *Id.* at 665-66.

In guiding dictum, the Court presumed "longstanding prohibitions on the possession of firearms by felons" to be valid because such laws might reflect the right's "scope" as would be revealed by "historical analysis." *Heller*, 554 U.S. at 626-27 & n.26. "[F]uture legislatures" could not override "the scope [rights] were understood to have when the people adopted them." *Id.* at 634.

"The Founding generation had no laws . . . denying the right [to keep and bear arms] to people convicted of crimes." Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009)). "Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding." *Id.* Yet *Heller*'s description of felon disarmament laws as "longstanding," in the sense that they comport with the Framers' understanding of the right's scope, may nonetheless be harmonized with the historical absence of such laws before the twentieth century. As the Fifth Circuit put it, "we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("*NRA*").

Thus, laws newly enacted in 1968 do not require a specific Framing Era analogue, just as ancient regulatory outliers do not override constitutional text owing to the fortuity that they evaded judicial review. But the analysis must be grounded in Framing Era thinking. "1791, the year the Second Amendment was ratified—[is] the critical year for

determining the amendment's historical meaning." *Moore*, 702 F.3d at 935 (citation omitted).

The analysis comes full circle when considering that Section 922(g)(1) was enacted to "keep firearms out of the hands of presumptively 'risky people.'" *United States* v. *Bass*, 404 U.S. 336, 345 (1971). "The broad objective of § 922(g)—suppressing armed violence—is without doubt an important one." *United States* v. *Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (citations omitted). The Framers may not have had felon disarmament laws, but they were well-acquainted with the concept of disarming "risky people" to "suppress armed violence."

> [A]ctual "longstanding" precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that . . . its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger.

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009).

"The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too

dangerous to possess firearms." *Binderup* v. *Atty. General*, 836 F.3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, J., concurring). Consider the evidence from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions that the Supreme Court described as "highly influential." *Heller*, 554 U.S. at 604.

Pennsylvania's convention saw a proposal that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971). At the Massachusetts ratifying convention, Samuel Adams proposed that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Journal of Convention: Wednesday February 6, 1788, *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788*, at 86 (Boston, William White 1856). And New Hampshire's convention proposed that

"Congress shall never disarm any Citizen unless such as are or have
been in Actual Rebellion." Schwartz, supra at 761; see also *NRA*, 700
F.3d at 200 (recounting Revolutionary Era disarmament of Loyalists as a
safety measure).

> In sum, the historical record leads [to the conclusion] that the public
> understanding of the scope of the Second Amendment was tethered to
> the principle that the Constitution permitted the dispossession of
> persons who demonstrated that they would present a danger to the
> public if armed.

*Binderup*, 836 F.3d at 369 (Hardiman, J., concurring) (footnote omitted).
"Responsible" people "who are no more dangerous with a gun than
law-abiding citizens generally are," who "pose only common levels of
risk" and who are "no more prone to misuse [arms] access than anyone
else," have Second Amendment rights, *Wrenn*, 864 F.3d at 664-66, as
contrasted with those whose possession of arms would threaten society.

An alternative view, advanced by three of the eight judges in the
*Binderup* majority, holds that the traditional standard for disarmament
is not dangerousness per se but lack of virtue. *Binderup*, 836 F.3d at 348-
49 (Ambro, J.). And more to the point, under this approach the two
concepts are not synonymous. Violent criminals "undoubtedly qualify as

11

'unvirtuous citizens,'" but "[t]he category of 'unvirtuous citizens' is . . . broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or non-violent." *Id.* at 348. A multifactor balancing test is then offered to delineate serious from non-serious crimes. *Id.* at 351-52. "[T]here are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," and "the category of serious crimes changes over time as legislative judgments regarding virtue evolve." *Id.* at 351.

This approach is rooted in the observation, made by this Court among others and acknowledged below, that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" Short Appx. at 5 (quoting *Yancey*, 621 F.3d at 684-85). Yet in *Yancey*, this Court treated lack of virtue as synonymous with dangerousness, following its virtuousness observation with "[a]s we've explained . . . most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." *Id.* at 685 (citation omitted).

In any event, whether "most" scholars believe the Framers were motivated to disarm people by considerations of "virtue" is beside the point. There is zero evidence that the Framers did so. As the other five judges in *Binderup*'s majority responded,

> We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that "virtuousness" was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.

*Binderup*, 836 F.3d at 372 (Hardiman, J., concurring). And "[t]his 'virtue' standard—especially in the pliable version articulated by the Government—is implausible because the 'civic republican' view of the scope of the Second Amendment is wrong." *Id.* at 371. The view is "closely related" to the discredited collective rights notion of the Second Amendment, and "stems from a misreading of an academic debate" concerning "the *rationale* for having the right to keep and bear arms in the first place" rather than who enjoys the right. *Id.* at 371-72.

Modern theories of "virtuousness" are no substitute for the copious *evidence* that dangerousness has always been the touchstone for disarmament. And perhaps more importantly for this appeal's purposes,

circuit precedent has upheld Section 922(g)(1) on a dangerousness rationale. Because felons, as a class, are viewed as posing a greater potential danger to society, their categorical disarmament is taken to be presumptively lawful. *Yancey*, 621 F.3d at 685.[3]

Indeed, "[a]ll of the circuits to face the issue post *Heller* have rejected blanket challenges to felon in possession laws." *United States* v. *Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (footnote omitted). But not all felons are dangerous—and some challenges have fared better.

## II. FELON DISARMAMENT LAWS ARE SUBJECT TO INDIVIDUALIZED AS-APPLIED CHALLENGES.

Defendants have argued against this as-applied challenge by pointing to the statutes' facial validity. Felons, as a class, may recidivate, and thus their categorical disarmament passes some level of even heightened scrutiny. But facial validity is irrelevant. "In upholding [a statute] against a facial challenge, we [do] not purport to resolve future

---

[3]"Virtue" is also not a useful judicial standard for determining who retains a fundamental right. It is perhaps axiomatic that *any* criminal activity suggests a lack of virtue. Strong arguments can be made that many low-level crimes reflect a lack of virtue or even hostility to basic social norms. Indeed, many non-criminal yet rude, selfish or disruptive actions may undermine a person's status as a "virtuous citizen," but should not cost one a fundamental right needed for self-defense.

14

as-applied challenges." *Wis. Right to Life, Inc.* v. *FEC*, 546 U.S. 410, 411-

12 (2006) (per curiam).

> A facial attack tests a law's constitutionality based on its text alone
> and does not consider the facts or circumstances of a particular case.
> An as-applied attack, in contrast, does not contend that a law is
> unconstitutional as written but that its application to a *particular
> person* under *particular circumstances* deprived *that person* of a
> constitutional right.

*United States* v. *Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citations

omitted) (emphases added). As-applied challenges do not threaten facial

validity, which requires only a "plainly legitimate sweep." *Wash. State

Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 450 (2008). A

familiar feature of constitutional adjudication, as-applied challenges are

especially necessary in the context of categorical disarmament laws.

A.    Legislatures Cannot Define the Scope of a Constitutional Right.

The provisions at issue are not triggered by a finding of

dangerousness, the constitutionally-acceptable justification for

disarmament. Unlike some state disarmament provisions, *e.g.*, 18 Pa.

C.S. § 6105(b); N.J. Stat. Ann. § 2C:39-7, they are not even triggered by

a conviction for an enumerated crime or type of crime. Rather, Section

922(g)(1) applies on the basis of an offense's potential sentencing range.

Wisconsin's prohibition applies to any crime classified as a felony. Wis. Stat. § 941.29(1m).

But "[a] crime's maximum possible punishment is 'purely a matter of legislative prerogative,'" *Binderup*, 836 F.3d at 351 (quoting *Rummel* v. *Estelle*, 445 U.S. 263, 274 (1980)), "subject only to 'constitutional prohibitions on irrational laws,'" *id.* (quoting *Heller*, 554 U.S. at 628 n.27) (other citation omitted). If this sort of legislative determination sufficed to place people outside the Second Amendment's scope, wholesale permanent denial of the right to arms would effectively be subject to rational-basis review. *Id.* And while "felony" may have a commonly-understood meaning, legislatures are free to define the term and classify crimes as they wish. Notably, Section 922(g)(1)'s colloquially-understood "felon in possession" ban applies to many misdemeanants.

In defining a fundamental right's scope, courts cannot blindly defer to legislative classifications. Both authors in the *Binderup* majority used the phrase "puts the rabbit in the hat" to dismiss the notion that sentencing classifications, without more, remove individuals from the

16

right's scope. *Binderup*, 836 F.3d at 350 (Ambro, J.); *id.* at 365 n.11

(Hardiman, J., concurring). "Why not" exclude people from the Second

Amendment's scope for "all misdemeanors?" *United States* v. *Chovan*,

735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring).

> Why not minor infractions? Could Congress find someone once cited
> for disorderly conduct to be "not law-abiding" and therefore to have
> forfeited his core Second Amendment right? . . . . Why should we not
> accept every congressional determination for who is or is not
> "law-abiding" and "responsible" for Second Amendment purposes?

*Chovan*, 735 F.3d at 1148 (Bea, J., concurring).

"Why not? Because *Heller* was a constitutional decision. It recognized

the scope of a passage of the Constitution. The boundaries of this right

are defined by the Constitution. They are not defined by Congress." *Id.*

"When the Second Amendment applies, its core guarantee cannot be

withdrawn by the legislature or balanced away by the courts." *Binderup*,

836 F.3d at 365 (Hardiman, J., concurring) (footnote omitted).

B.   This Court Follows the Majority Rule Allowing Individualized
     As-Applied Challenges to Felon Disarmament Laws.

As noted, the Supreme Court has described felon disarmament

provisions as "presumptively lawful." *Heller*, 554 U.S. at 626-27 n.26.

The qualifying effect of the term "presumptively" has not been lost on

this Court. "*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010).

Most circuits that have considered the issue share this view. "Unless flagged as irrebutable, presumptions are rebuttable." *Binderup*, 836 F.3d at 350 (citations omitted). "A presumption of constitutionality 'is a presumption . . . [about] the existence of factual conditions supporting the legislation. As such it is a *rebuttable* presumption.'" *Id.* at 361 n.6 (Hardiman, J., concurring) (quoting *Borden's Farm Products Co.* v. *Baldwin*, 293 U.S. 194, 209 (1934)).

> [W]e doubt the Supreme Court couched its first definitive characterization of the nature of the Second Amendment right so as to completely immunize this statute from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is *presumptively* lawful.

*Id.* (internal quotation marks omitted).

The First Circuit agrees. "[T]he Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the

basis for applying a categorical [firearms] ban," or, phrased differently, "the Supreme Court might find some felonies so tame and technical as to be insufficient to justify [a firearms] ban." *Torres-Rosario*, 658 F.3d at 113. The Eighth Circuit rejected an as-applied challenge to Section 922(g)(1) where the felon "has not shown that he is 'no more dangerous than a typical law-abiding citizen." *United States* v. *Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (internal quotation marks omitted).

The Ninth Circuit has also left the matter open. No individualized criteria were at issue in *United States* v. *Phillips*, 827 F.3d 1171 (9th Cir. 2016), which rejected a categorical challenge to basing Section 922(g)(1)'s disability upon a traditional if nonviolent felony. But that court noted that it remains open to "the question of whether there are limits on Congress's and the States' ability to define any old crime as a felony and thereby use it as the basis for a § 922(g)(1) conviction, consistent with the Second Amendment." *Phillips*, 827 F.3d at 1176 n.5. "Can a conviction for stealing a lollipop . . . serve as a basis under § 922(g)(1) to ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment? That remains to be seen." *Id.*;

*see also Fortson* v. *L.A. City Attorney's Office*, 852 F.3d 1190, 1194 (9th Cir. 2017) (denying relief for lack for individualized distinction). The D.C. Circuit offered that absent the prospect of administrative relief,

> the federal firearms ban will remain vulnerable to a properly raised as-applied constitutional challenge brought by an individual who, despite a prior conviction, has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home.

*Schrader*, 704 F.3d at 992 (internal quotation marks and punctuation omitted).

Two circuits have departed from the trend. "We have already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)." *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (citing *United States* v. *McCane*, 573 F.3d 1037 (10th Cir. 2009)) (unpublished order but attached to published dissent). The Fourth Circuit, which had repeatedly acknowledged the prospect of as-applied relief from felon dispossession laws, recently backtracked. "Operating under this presumption of lawfulness, we have recognized the possibility that an as-applied challenge to a felon disarmament law could succeed in rebutting the presumption." *Hamilton* v. *Pallozzi*, 848 F.3d 614, 622-23 (4th Cir. 2017) (citation omitted). But that court now

20

"hold[s] that a challenger convicted of a state law felony generally cannot satisfy step one" of the Second Amendment inquiry, *id.* at 625, unless "the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful," *id.* at 626. *Hamilton* did note, however, that misdemeanants swept within "felon disarmament laws" may yet obtain as-applied relief. *Id.* n. 11.[4]

SAF submits that this Court, and others following the majority rule, have the better of the argument. In any event, the District Court was bound by *Williams* (if not by *Heller*) to conduct an actual as-applied analysis.

---

[4] The federal government often claim that Fifth, Ninth, and Eleventh Circuit precedent forecloses individualized as-applied challenges to Section 922(g)(1). SAF disagrees. In *United States* v. *Scroggins*, 599 F.3d 433 (5th Cir. 2010), the felon did not raise a constitutional argument at trial. On plain error review, the Fifth Circuit rejected his claim that Section 922(g)(1) could only be constitutional if he had a violent intent in possessing the gun. The Ninth Circuit's statement that "felons are categorically different from the individuals who have a fundamental right to bear arms," *United States* v. *Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), does not address as-applied relief. *See also Phillips*, 827 F.3d at 1176 n.5; *Fortson*, 852 F.3d at 1194. And in *United States* v. *Rozier*, 598 F.3d 768 (11th Cir. 2010) (per curiam), the only "as-applied" claim rejected was based on the felon's motive to possess a gun (home defense), not his personal circumstances.

III.  RICKEY KANTER IS ENTITLED TO RELIEF BECAUSE HE IS A LAW-
      ABIDING, RESPONSIBLE CITIZEN POSING NO HEIGHTENED RISK OF
      GUN VIOLENCE.

  A.  The District Court Erred in Refusing to Acknowledge Kanter's
      Individualized Claim.

The District Court's perfunctory discussion failed to consider the as-

applied nature of Kanter's claim.

> [E]ven though Kanter engaged in a non-violent felony, the fact that
> he committed *any* felony, a serious violation of the criminal law,
> places him within that category of persons which Congress and the
> Wisconsin legislature found are more likely to abuse firearms. The
> dispossession statutes recognize that *all* felons, violent or not, have
> clearly disrespected important laws in the past.

Short Appx. 8 (emphasis added). Absent here is any consideration of

what Kanter did, his lack of propensity for violence, his lack of

recidivism, his history with firearms, the stability of his personal life or

the role Kanter plays in his community. To the court below, it was

constitutional to disarm "a convicted felon." *Id.* This is not an

individualized as-applied analysis. It is merely the rote application of a

facially-valid law.

Kanter would have offered a compelling case even had he framed his

as-applied challenge in categorical terms, arguing only that mail fraud

convictions do not indicate a propensity for gun violence. But Kanter's claim is yet stronger, as it is narrowly based on his personal circumstances, among which the predicate crime's nature is just one factor. Kanter demonstrated that he has always been a peaceful and productive family man and member of the community. Nothing about Kanter's record or personal history suggests that he is "more dangerous with a gun than law-abiding citizens generally are," "poses [more than a] common level[] of risk" when possessing firearms, or is "more prone to misuse" firearms than anyone else. *Wrenn*, 864 F.3d at 664, 666. For their part, defendants offered no evidence that Kanter is, in fact, dangerous with firearms.

B. Kanter's Claim Requires Only One Step.

The District Court also erred in forcing the "round peg" of Kanter's as-applied challenge into the "square hole" of the familiar, but not mandatory, two-step Second Amendment process. In *Heller*'s wake, appellate courts, including this Court, have often applied a two-step means-ends scrutiny test in Second Amendment cases. At step one, courts ask whether the challenged laws implicate conduct secured by the

Second Amendment. If not, the matter ends there. Otherwise, step two calls for the application of a balancing test to measure the appropriate level of constitutional "fit" between the governmental interests and the law. *Ezell I*, 651 F.3d at 703-04.

But the parties and the District Court erred in assuming that the two-step process best answers all Second Amendment questions. It does not. Neither the D.C. Circuit nor the Supreme Court in *Heller* employed means-ends scrutiny to test Washington, D.C.'s challenged gun prohibitions, striking them down simply upon a finding that the laws were inconsistent with the rights guaranteed by the amendment. As useful as means-ends scrutiny may often be, courts would not apply it to laws establishing a state religion or mandating torture as a criminal punishment. The Second Amendment is no different. "A statute which, under the pretence of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional." *Heller*, 554 U.S. at 629 (internal quotation marks omitted). Where rights are effectively destroyed, nothing remains for balancing. "It's appropriate to strike down such 'total ban[s]' without bothering to apply tiers of scrutiny because no

such analysis could ever sanction obliterations of an enumerated

constitutional right." *Wrenn*, 864 F.3d at 665 (citation omitted).

This Court agrees. In adopting the two-step method, *Ezell I*

distinguished "broadly prohibitory laws restricting the core Second

Amendment right" which are "categorically unconstitutional," from

those questioned in "all other cases" calling for means-ends scrutiny.

*Ezell I*, 651 F.3d at 703 (citations omitted). "[R]esolving Second

Amendment cases *usually* entails two inquiries." *Ezell II*, 846 F.3d at

892 (emphasis added). But not always.

As Judge Hardiman explained for five of eight judges in the *Binderup*

majority, individualized as-applied challenges fall into the first category.

"It is true that courts typically apply some form of means-end scrutiny to

as-applied challenges once it has been determined that the law in

question burdens protected conduct." *Binderup*, 836 F.3d at 363

(Hardiman, J., concurring).

> But when . . . it comes to an as-applied challenge to a presumptively
> lawful regulation that *entirely bars* the challenger from exercising the
> core Second Amendment right, any resort to means-end scrutiny is
> inappropriate once it has been determined that the challenger's
> circumstances distinguish him from the historical justifications
> supporting the regulation. This is because such laws are categorically

invalid as applied to persons entitled to Second Amendment
protection—a matter of scope.

*Id.*; *see also Britt* v. *State*, 363 N.C. 546, 681 S.E.2d 320 (N.C. 2009).

The laws challenged here do not regulate Kanter's possession or use
of firearms; they completely prohibit him from even possessing guns. If
Kanter can prove that he belongs among "the 'law-abiding, responsible
citizens' whose Second Amendment rights are entitled to full solicitude
under *Heller*," *Ezell I*, 651 F.3d at 708, if he can establish that "despite
[his] prior conviction, [he] has become a law-abiding, responsible citizen
entitled to use arms in defense of hearth and home," *Schrader*, 704 F.3d
at 992 (internal quotation marks and punctuation omitted), there is no
interest in disarming him. This type of case involves no second step. It
ends when the challenger is deemed dangerous, or not, based on a
holistic assessment of the challenger's circumstances.[5]

One of the decisions affirmed in *Binderup* sought to employ the two-
step framework in the individualized as-applied context, and in so doing,

---

[5]*Williams* utilized intermediate scrutiny to test an as-applied
challenge to Section 922(g)(1) "without determining that it would be the
precise test  applicable to all challenges to gun restrictions." 616 F.3d at
692. The government prevailed "by pointing to Williams's own
violent past." *Id.* at 693.

explained the problem neatly.

> [I]f a challenger [demonstrates] that he is outside the scope of §
> 922(g)(1), and thereby shows he is a law-abiding citizen who falls
> within the core of the Second Amendment's protection, any
> means-end scrutiny would be fatal in fact . . . . [a]s a practical matter,
> therefore, an analysis of the second prong . . . is futile. Accordingly,
> we find that in the context of an as-applied Second Amendment
> challenge to § 922(g)(1), the analysis begins and ends with [one-step
> precedent].

*Suarez* v. *Holder*, 255 F. Supp. 3d 573, 583 (M.D. Pa. 2015) (footnote and
citations omitted), *aff'd sub nom Binderup*, supra.

Of course, Kanter would also prevail under an intermediate scrutiny
analysis, because there is no evidence tying him, specifically, to
dangerousness. The federal government would cite to various empirical
studies of people not named Rickey Kanter, and often invokes, as it did
below, the proposition that "nonviolent offenders not only have a higher
recidivism rate than the general population, but certain groups —such as
property offenders—have an even higher recidivism rate than violent
offenders, and a large percentage of the crimes nonviolent recidivists
later commit are violent." Dist. Ct. ECF 24-1, at 13 (quoting
*Kaemmrling* v. *Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008)).

But what "offenders" and "groups" may or may not do is irrelevant. The focus here is on Rickey Kanter. And if a mere shoplifter cannot obtain individualized as-applied relief because some study asserts that shoplifters might murder people in the future, there is no point pretending that as-applied relief exists only to be invariably defeated under some level of "scrutiny."

IV.    While Policy Considerations Cannot Override Fundamental Rights, Failure to Acknowledge Individualized Relief from Felon Disarmament Laws Would Have Absurd and Dangerous Results.

The federal government often complains that individualized assessments are too burdensome to litigate, and that its efforts to administer the individualized disarmament relief provisions of the now-defunded Section 925(c) yielded poor results.

The arguments are unavailing. If the government has the time and resources to operate a breathtakingly-broad law like Section 922(g)(1), it should find a way to ensure that individuals posing no threat to public safety do not have their fundamental rights swept away. As the D.C. Circuit warned Congress, this type of litigation should be expected so long as Section 925(c) remains unfunded. *Schrader*, 704 F.3d at 992.

And any defects in the Section 925(c) process are beside the point. As

Judge Hardiman pointed out,

> a constitutional inquiry into a presumptively lawful statute is distinct
> from the one- sided, fact-intensive inquiry that would have been
> called for were courts required to assess § 925(c) petitions in the first
> instance. Reviewing an as-applied constitutional challenge based on
> facts alleged by a challenger and weighing those facts against
> competing evidence proffered by the Government is not only
> something courts are equipped to do, it is our constitutional duty.

*Binderup*, 836 F.3d at 366 n.13 (Hardiman, J., concurring) (citations

omitted).

Every day in America, people verify and disprove all manner of

personal information about each other in a wide array of legal disputes.

The federal government is very good at conducting background checks,

pre-sentence reports, and civil discovery. And jurisdiction over

constitutional claims is not optional. "The judiciary cannot, as the

legislature may, avoid a measure because it approaches the confines of

the constitution. We cannot pass it by because it is doubtful." *Cohens* v.

*Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

The day where the government might permanently deprive

individuals of all Second Amendment rights on account of relatively

trivial offenses has arrived. In Massachusetts, shoplifting goods valued at $100, or the second offense of selling pigs without a license, are both misdemeanors punishable by two-and-a-half years imprisonment and thus trigger Section 922(g)(1). *See* Mass. Gen. Law c. 266, § 30A; *id.* c. 129, §§ 39, 43. The preceding three Presidents would have been permanently disarmed had they possessed their marijuana in Arizona. *Binderup*, 836 F.3d at 372 n.20 (Hardiman, J., concurring) (citation omitted). Anyone redeeming out-of-state bottle deposits in Michigan, such as *Seinfeld*'s Newman and Kramer, or stealing $150 from a Pennsylvania library, faces federal disarmament. *Id.* (citations omitted).

Prosecutorial overreach further poses concerns. For example, while Florida punishes the release of balloons as a noncriminal infraction subject to a $250 fine, Fla. Stat. § 379.233, one Florida man faced a third-degree felony charge, punishable by five years imprisonment, for releasing a dozen heart-shaped balloons as a gesture to his girlfriend.[6]

---

[6] *See* Erika Pesantes, *Love hurts: Man arrested for releasing helium balloon with his girlfriend*, Sun Sentinel, February 22, 2013, available at http://articles.sun-sentinel.com/2013-02-22/news/fl-helium-balloon-environmental-crime-20130222_1_helium-balloon-fhp-trooper-wood-stor ks (last visited Apr. 17, 2018). The gentleman was initially charged under the general felony pollution statute, Fla. Stat. § 403.161(1)(a),

Should that transgression have cost him his fundamental Second Amendment rights forever?

Such deprivations of Second Amendment rights are not without consequence—for the individuals who lose their rights, and for society. The Second Amendment reflects the policy judgment that there is value in affording individuals the means of defending themselves. Needlessly disarming law-abiding, responsible citizens thus carries a cost. Consider the case of Thomas Yoxall, convicted of felony theft in 2000, who three years later successfully asked that his conviction be reduced to a misdemeanor so that he might regain his firearm rights. Last year, Yoxall used his gun to save an Arizona trooper who had been shot and was being beaten to death on the side of a highway.[7] The harm some may

---

albeit coded as "Haul Waste Tire w/out a Permit." *See State of Florida* v. *Anthony Cade Brasfield*, Broward County (Fl.) Case No. 13002444CF10A (filed Feb. 18, 2013).

[7]*See* Megan Cassidy, *A visceral reaction with no time to spare: Arizona man gives emotional account of saving DPS trooper*, Arizona Republic, Jan. 24, 2017, available at http://www.azcentral.com/story/news/local/southwest-valley/ 2017/01/24/phoenix-man-gives-emotional-recount-taking-life-save-trooper/97005886/ (last visited Apr. 17, 2018).

pose on account of 18-year-old theft convictions is theoretical. Trooper Andersson being alive today is real.

## CONCLUSION

The judgment should be reversed, and the case remanded for further proceedings.

Dated:   April 17, 2018         Respectfully submitted,

Alan Gura
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

Counsel for Amicus Curiae

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Seventh Circuit Rule 29 because this brief contains 6,140 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.


/s/ Alan Gura_____
Alan Gura

CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2018, I filed the foregoing with the

Clerk of the Court using the CM/ECF System, which will send notice of

such filing to all registered CM/ECF users.

/s/ Alan Gura
Alan Gura